Appellant was tried on an indictment charging him with murder in the first degree of Clyde Davis, "by shooting him with a pistol." A jury found him guilty of murder in the second degree and fixed his punishment at imprisonment for fifteen years, and the court sentenced him accordingly.
As we find it necessary to reverse the judgment by reason of a single erroneous error of the able and distinguished trial judge, we deem it appropriate to use as a factual background the Statement of Facts appearing in appellee's brief, even though to some extent there is a variance between it and appellant's brief. Appellee's complete statement of the facts contained in its brief under the caption STATEMENT OF THE FACTS
is as follows:
 "Early in the morning of April 15, 1979, the Appellant and three other persons, Larry Garner, William J. Venable and Phil Payne, were riding around in Appellant's automobile. Around 2 a.m. they drove to Gowan's Truck Stop and parked in the front.
 "The purpose of going to the truck stop was to advise the persons who worked there that Appellant's service station would be closed on Easter day but that the service vehicles would be available. Upon arriving at the truck stop, Garner went inside to give this information to the people there. The others remained in the car.
 "While sitting in the car, a conversation took place on the C.B. radio between the Appellant and a truck driver parked at the truck stop. Venable, a witness for the State, testified that the first time he paid any attention to the conversation the truck driver was `talking back to Mr. Payne and said words to the effect that if he would bring his white MF. a__ around front, he would set it on fire.' He then heard Appellant say `I'm fixing to show my G_d d___ a__.'
 "Another witness for the State, a police officer, John Wilson, testified that he had heard a conversation between Appellant and another party on Channel 19 on his C.B. radio. He heard Appellant call the truck driver a `black son of a b____' and the truck driver responded `you white honky M.F.' He recalled the Appellant asking the truck driver if he could meet him some where. He said the truck driver stated that `he had a weapon in the truck and that if Mr. Payne came out there that he would shoot him.' and Appellant responded that `if the truck driver would come out on the street he would in return shoot him.' He heard the other party say that he was in a red Wiley Sanders tractor trailer rig parked at the Gowan's Truck Stop parking lot. Appellant said he was in a green Continental. "Appellant denied this conversation saying the only conversation he had with the deceased was that he told him to get off the C.B. and the truck driver said `I'm going to set your a__ on fire.'
 "After Garner came out of the truck stop and got back in the car, the Appellant drove over to the truck where the truck driver was at. As he drove alongside the truck the truck driver's door was thrown open and shots fired. Appellant also fired. Appellant fired the shot that killed the truck driver [the alleged victim]."
The only issue raised by appellant is as to defendant's exception to a portion of the court's oral charge. In its oral charge the court charged the jury as to murder in the first degree, murder in the second degree, manslaughter in the first degree and manslaughter in the second degree. An exception was taken to a part of the court's oral charge while instructing the jury on murder in the second degree. It was as follows:
 "A killing by a fight and single combat, commonly called a duel, with deadly weapons is also murder in the second degree under the laws of the State of Alabama. A duel is a single combat or fight engaged in by two persons with deadly weapons by agreement or by prearrangement. No particular form of words are necessary to constitute a challenge or agreement or by prearrangement *Page 142 
to fight a duel. Whether or not a challenge, agreement or prearrangement to fight a single combat with deadly weapons was intended or whether it was a mere fusion of passion or folly or idle boast of a braggart not intended at the time to lead to any result or to be understood by the other party as a challenge to fight a duel are questions which you must decide before you would be justified in rendering a verdict of murder in the second degree under the duel statute." (Emphasis supplied)[1]
Some time after the jury had commenced deliberation, it returned for "definitions for the charges of homicide again," and the court repeated or substantially restated its oral charge on the subject, including that part of the oral charge quoted above. At the conclusion of the court's additional oral charge, the transcript shows the following as occurring before the jury again returned to the jury room:
 "MR. ROBISON: Again, Your Honor, we would except to that portion of your charge to the statutory section on dueling, as earlier stated."
For whatever significance it may be, it is to be noted that in raising the point before the jury retired to commence its deliberation, the following occurred:
 "MR. ROBISON: If the Court please, we would object to that portion of Your Honor's charge as it pertains to the statutory offense on dueling.
 "THE COURT: So noted. I will allow you to state your grounds in just a moment."
After the jury commenced its deliberations, the following occurred out of the presence of the jury:
 "THE COURT: Mr. Robison, if you want to state some grounds you can go ahead and do so now.
 "MR. ROBISON: Would it be all right if I prepared those and submitted them to you?
"THE COURT: I have no problem with that.
"MR. POOLE: I have no objection."
We understand that there is no disagreement whatever between the parties on appeal as to the sufficiency or timeliness of defendant's objection or exception to the court's oral charge on the subject of dueling or a duel, but to bring to light any possible misunderstanding, we note that the record shows that on January 28, 1980, about five months after the trial, but about one month before the filing of the transcript of the proceedings, the following document was signed and filed by defendant's counsel with the Circuit Clerk:
 "The defendant objects to that portion of the Court's charge pertaining to a duel between the Defendant and the deceased, Clyde Davis, a legal basis to convict the defendant of second degree murder. As grounds for said objection, the defendant says:
 "That the offense defined in Title 13-1-71 of the 1975 Code of Alabama is not a lesser included offense covered by the indictment of murder returned against the defendant and on which indictment the defendant was tried.
 "That the portion of the charge of the Court authorizing a conviction of second degree murder for killing by a fight in single combat, commonly called a duel, with deadly weapons, is improper under the indictment for murder brought against Defendant and on which he was tried.
 "That the indictment charging the defendant with the killing of Clyde Davis unlawfully and with malice aforethought by shooting him with a pistol is insufficient to authorize the Court to charge the jury on the killing by a fight in single combat with deadly weapons, the offense defined in Title 13-1-71 of the 1975 Code of Alabama."
Appellee well argues, and supports his argument by citations to a number of authorities, that murder in the second degree is a lesser included offense in an indictment *Page 143 
charging murder in the first degree. As to that well established principle there can be no doubt. The decisive question, however, is whether murder in the second degree as statutorily defined by Code of Alabama 1975, § 13-1-71, captioned "Killing in duel," is a lesser included offense of murder in the first degree. As to this, we are cited no authority by either party, and we believe it to be a case of first impression in Alabama.
There seems to be no disagreement as to the controlling principle, that to be a lesser included offense of one charged in an indictment, the lesser offense must be one that is necessarily included, in all of its essential elements, in the greater offense charged. Mayes v. State, Ala.Cr.App.,350 So.2d 339 (1977); Sharpe v. State, Ala.Cr.App., 340 So.2d 885 (1976);Powers v. State, 49 Ala. App. 690, 275 So.2d 369 (1973); Cochranv. State, 42 Ala. App. 144, 155 So.2d 530 (1963).
To determine whether the evil proscribed by the single short sentence contained in § 13-1-71 of the Code, "Killing by fight in single combat, commonly called a duel, with deadly weapons is murder in the second degree," requires comprehensive consideration of the word "duel" as thus employed. Of great significance is the fact that in looking to legal publications within the last several decades for material on the subject, we find, other than references to occurrences many decades before, a vacuum. We find no reported case in Alabama of a trial for killing another in a duel. The dearth of modern law on the subject is emphasized by the brevity of Corpus Juris Secundum (1941) in its five-page treatment of the subject (28 C.J.S.Dueling) and its one-case annotation in its 1979 Pocket Part.[2]
At 28 C.J.S. Dueling § 1a (1), we find:
 "Dueling is the act of fighting with deadly weapons between two persons in pursuance of a previous agreement; and it is immaterial at what time prior to the encounter the agreement was made . . . Dueling is distinguished from other offenses in that it has none of the elements of sudden heat and passion, and is usually carried out with some formality. . . ."
We take it also that the following is correct:
 "Duel. A duel is any combat with deadly weapons, fought between two or more persons,[3] by previous agreement or upon a previous quarrel. Baker v. Supreme Lodge K.P., 103 Miss. 374, 60 So. 333, Ann.Cas. 1915 B, 547.
 "Duelling. The fighting of two persons, one against the other, at an appointed time and place, upon a precedent quarrel. It differs from an affray in this, that the latter occurs on a sudden quarrel, while the former is always the result of design." Black's, L.D. (4th Ed. 1951)
It is also highly significant, we think, on the question hereafter discussed as to the present existence of the particular conduct that in one period or another was considerably in vogue in some places of the world, that Wordsand Phrases, Duel (1965) contains approximately two columns, to which nothing is supplemented by the 1979 Pocket Part.
In Corpus Juris Secundum, Black's Law Dictionary and Wordsand Phrases, all supra, the citation of the case of Baker v.Supreme Lodge, K.P., 103 Miss. 374, 60 So. 333 (1913) is prominent. In that case the facts were that deceased was approached by a man named Lester, who threatened to kill him. Deceased told Lester he was unarmed, but if he would permit deceased to get to his cash drawer, he would "shoot it out with him." Deceased went toward the cash drawer, but, before reaching it, drew a pistol from his bosom and turned toward Lester, who shot and killed him. The legal question was whether the particular transaction *Page 144 
was a duel, within the terms of a life insurance policy limiting insurer's liability "if the death of [Baker] (the insured) be `caused or superinduced . . . in consequence of a duel.'" The court said:
 "A duel, as the term is ordinarily understood, and as used in this policy, `is the fighting together of two persons by previous concert with deadly weapons to settle some antecedent quarrel,' and has none of the elements of sudden heat and passion. 2 Bishop's Criminal Law (8th Ed.) 313; Black's Law Dictionary, page 399; Century Dictionary Encyclopedia, Vol. 3, page 1792; Davis v. Modern Woodman, 98 Mo.App. 713, 73 S.W. 923; Ward v. Commonwealth, 132 Ky. 636, 116 S.W. 786, 19 Ann.Cas. 71. The fight, if such it was, in which Baker lost his life, had none of the elements of a duel as thus defined, but was brought about without premeditation on his part by the acts and words of Lester. Nothing said in Thomas v. State, 61 Miss. 60, is in conflict herewith. The court in that case was not dealing with a duel in the common acceptation of the term."
From what has been observed, we must conclude that a homicide "by fight in single combat, commonly called a duel, with deadly weapons" as defined by § 13-1-71 of the 1975 Code contains one or more essential elements not necessarily included in the crime of murder in the first degree. This is obvious by the known fact that there are many instances of murder in the first degree in which all of the circumstances are antipodal to every element of killing "by fight in single combat, commonly called a duel," except as to the element of death that is common to both. To constitute the crime denounced by the particular section of the Code, there must be a fight. In murder in the first degree, a fight is not an essential element. In dueling, deadly weapons are essential; in murder, they are not. It is clear also that to constitute a duel there must be more than a one-to-one fight with deadly weapons, voluntary though it may be by both participants.
In every Constitution of Alabama, from and including the first (1819) to and including the last (1901), there has been a provision empowering the legislative department to pass laws to "suppress the evil practice of dueling."
 "The general assembly shall have power to pass such penal laws to suppress the evil practice of duelling, extending to disqualification from office or the tenure thereof, as they may deem expedient." Constitution of Alabama 1819, Art. VI, Sec. 3
 "The legislature shall pass such penal laws as it may deem expedient to suppress the evil practice of dueling." Constitution of Alabama 1901, Art. IV, Sec. 86
On December 17, 1919, the General Assembly of Alabama enacted a statute substantially the same as that codified in every Code of Alabama to and including Code of 1975, § 13-1-71. The law stands repealed as of the effective date of the new Alabama Criminal Code, Act No. 607, § 9901, Acts of 1977, p. 812.
Worthy also of observation as to how the "strange mutations" of time have affected conduct that in periods of its existence vacillated between an "affair of honour" and a "crime" has been the fate of a statute in Alabama enacted January 7, 1836, to be found in every succeeding Code to and through the Code of 1940, Tit. 41, § 20, requiring a dueling (anti-dueling retrospective and prospective) oath by every public officer prior to his taking office. The law was expressly repealed by Act No. 28, Acts 1951, p. 239, appvd. May 23, 1951.
Of like moment is In re Dorsey, 7 Port. 293 (1838). At that time the statutory law of Alabama required an applicant for admission to the practice of law to take a "dueling oath." The Honorable John L. Dorsey was reluctant to do so. He moved the Supreme Court to admit him as an attorney and counsellor of the Court, and to dispense with the administration to him of the oath. His pro se argument is "abridged" by the Reporter in fifty-four pages. The opinions of Justices Goldthwaite *Page 145 
and Ormond and Chief Justice Collier are contained in the remaining approximately fifty pages of the report of the case. With Chief Justice Collier dissenting, the court held that that part of the Act requiring the prescribed oath was unconstitutional.
Although not essential to a correct disposition of the issue now before us, we conclude also that the testimony in the instant case fails to show a duel or that which is "commonly called" a duel. From the authorities in the field of law on the subject, we now turn to the authorities in the field of language. In doing so, we adhere to the trunk of the basic or primary signification of the word duel, or the like, exclusive of partly parasitic branches that embrace every kind of physical combat, as well as intellectual contest, as a duel.
As to such primary signification, we find:
"Duel.
 "1. A regular fight between two persons; a single combat. spec. Obs. a. A judicial single combat; trial by wager of battle Obs. exc. Hist.
"[1284 Act 12 Edw. I (Stat. Walliae) c. 8, Placita de terris in partibus istis non habent terminari per duellum, neque per magnam assisam (Omitted are several chronologically arranged citations and references, to 1875, relative to the previous right of a party, whether the plaintiff or the defendant, to `put the Trial upon the Duel.')]
 "b. In current use: A private fight between two persons, pre-arranged, and fought with deadly weapons, usually in the presence of at least two witnesses called seconds, having for its object to decide a personal quarrel or to settle a point of honor.
 "[1606 Bryskett. Civ. Life 65 This kind of challenging and fighting man to man, under the name of Duellum, which is used now adayes among souldiers and men of honour, and by long custome authorized, to discharge a man of an injury received. (Omitted are several references in chronological order until 1840 relative to the transition in England from the judicial duel to a duel as to which the courts would have no part.)]
 "c. A sustained fight between two animals [Omitted are two references to such a fight]." The Oxford English Dictionary, Vol. III, p. 705 (1961).
We find nothing in the works of men and women of letters and general learning that would ever picture the transaction that took place between defendant and his victim as a duel, as a "single combat, commonly called a duel." From their detached and scholarly standpoint they have written to the contrary. Failing memories of that which has been so well known in the past are revived by reading again what was written by authors long gone, as well as by studying the facts of history as recorded by authors of the present generation, such as the following, as a part of that written by Robert Baldick, Oxford University, author of "The Duel":
 "Duel, a form of combat between two persons usually armed with lethal weapons and fought in the presence of witnesses according to a certain ceremony and a strict code of law or honor.
". . . .
 "In England, trial by combat (duel) remained the only means of deciding a matter of right until the reign of Henry II, who instituted the alternative of trial by jury. Even then, judicial duels continued to be fought occasionally and the right to choose trial by combat lingered as a part of English law until the early 19th century. In 1817 a certain Abraham Thornton, charged with murder, claimed the right to `wage his battle.' As no one could be found to fight for the victim, Thornton was acquitted. Soon afterward, on March 22, 1819, Parliament abolished the right to appeal to the `judgment of God,' and with it the judicial duel.
 "Today, with the exception of a few undercover duels fought by students in German Korps, some lighthearted affairs at England's ancient universities, and occasional encounters in France conducted with a minimum of risk and the maximum of publicity, the duel is dead. It *Page 146 
was killed not so much by legislation as by press ridicule, disapproval, and a more humane attitude to the conduct of human relations." Encyclopedia Americana, Vol. 9, pp. 455-456 (1972).
It seems that he is right, that the evil "commonly called a duel" is now dead, has been dead and buried for many years, and there has been no general resurrection of it. The incident involved in the instant case was not a resurrection of its body. In the most favorable light to the appellee on the issue, it purports to be nothing more than a reincarnation or transmigration of its soul.
Witnesses to the extinction in Alabama of the evil "commonly called a duel" include Honorable Peter A. Brannon, former director, Department of Archives and History of Alabama. In his article, Dueling in Alabama, Alabama Historical Quarterly, Vol. 17-1955, pp. 197-204, he commences:
 "The practice of dueling prevailed in what is now Alabama, from the very earliest days of this territory down to near the beginning of the War Between the States."
He discusses several duels in Alabama, some just over the border-line between Alabama and Mississippi and between Alabama and Georgia, but he mentions none as having occurred during an entire century prior to the publication of the article-none during half of a century before the passing of the livery stable. His recital of the duels that were fought includes no combat that can be likened to the one in the instant case. Such incidents occurred then, have occurred ever since and are much too often now. They are not duels.
It was a mistake to inject an issue as to dueling into the instant case. The very nature of the evil would prevent its being grafted or budded into another evil. Even during periods of its common occurrence it was sui generis. In the absence of compelling reasons to the contrary, the case should be tried again, that a jury may determine the issue as to self-defense in the light of the applicable principles of law unclouded by the unique and inapplicable intricacies of a duel.
For the error indicated, the judgment of the trial court should be reversed and the cause remanded.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under § 6.10 of the Judicial Article (Constitutional Amendment No. 321); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby reversed and the cause remanded.
REVERSED AND REMANDED.
All the Judges concur.
[1] The emphasized language is apparently taken from Ivey v.State, 12 Ala. 276, 280 (1847), a "challenge to fight" a duel case. See Code of Alabama 1975, § 13-1-2.
[2] We do not overlook the single sentence reference to a "combat . . . as in a duel" in the two-paragraph section on homicide (40 C.J.S. Homicide § 17), or the two citations in annotating such sentence in the 1979 Pocket Part. Nor do we overlook C.J.S. General Index B-1 Dueling.
[3] We question somewhat the "or more."