This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**AUTOMATED FINANCIAL**
**TECHNOLOGIES, LLC,**

Protestant-Appellant,

v.                                                  **NO.   30,828**

**TAXATION AND REVENUE DEPARTMENT**
**OF THE STATE OF NEW MEXICO,**

Respondent-Appellee.

**APPEAL FROM THE DECISION AND ORDER 10-16**
**Sally Galanter, Hearing Officer**

The Loubet Law Firm, LLC
Jeffrey W. Loubet
Albuquerque, NM

for Appellant

Gary K. King, Attorney General
Patrick Edward Preston, Special Assistant Attorney General
Taxation & Revenue Department
Santa Fe, NM

for Appellee

**MEMORANDUM OPINION**

**KENNEDY, Judge.**

This case presents the issue whether a company that operates automatic teller machines (ATM) is entitled under NMSA 1978, Section 7-9-61.1 (1981) to deduct from its gross receipts tax, the surcharge fees collected from ATM customers. The proposed deductions encompass all of Automated Financial Technologies's (AFT) gross receipts income and, thus, would entirely eliminate AFT's gross receipts tax altogether. Because the surcharge fees are not payments received from charges made in connection with the origination, making, or assumption of a loan, the deduction for such payments under Section 7-9-61.1 is improper. We therefore affirm the Taxation and Revenue Department (Department) hearing officer's decision that AFT is not entitled to claim such deductions.

**I.    BACKGROUND**

AFT is an independent sales organization owning and operating ATMs inside "casinos, restaurants, ice cream stores, hotels, and hospitals" within New Mexico. "AFT places its funds in [its] ATMs for withdrawal by customers of banks or financial institutions." "To withdraw cash, the customer inserts his/her credit or bank . . . card" and, through AFT's use of a software program, directly accesses his/her bank account using a personal identification number. "The customer is [then] led through a series

of prompts by the ATM" to access funds from his/her bank account. One of the prompts "notifies the customer that there will be a flat fee of $2 or $3 associated with obtaining the cash" and gives the customer the option of discontinuing the transaction if he/she does not want to incur the fee. Upon receiving an affirmative response to continue, the ATM accesses the customer's bank account, determining whether the customer has sufficient funds in his/her account to obtain the cash. If the bank account shows that it has insufficient funds to pay for the transaction, "the ATM will deny the customer the cash." If the customer's account has sufficient funds, "the ATM will provide the customer the cash[,]" instantly committing the customer's bank account. The amount received in cash plus AFT's surcharge fee are immediately "deducted from the customer's [bank] account." The bank, "having deducted the amount of cash its customer received and the surcharge fee from its customer's account, . . . then reimburse[s] AFT for the cash disbursed and for the surcharge fee charged by AFT within three or four days of the disbursement." All of AFT's income comes from surcharge fees paid by customers obtaining cash through the ATMs. The Department audited AFT in 2006 for gross receipts taxes filed from April 2000 through December 2005. Based on the audit, "[t]he Department determined that AFT failed to report and pay [g]ross [r]eceipts [t]ax on the surcharge fees it . . . receiv[ed] from customers utilizing its ATMs for cash withdrawals." The Department

3

assessed AFT for back taxes, compensating taxes, and interest. AFT protested the assessment of gross receipts and interest, arguing that the assessment was improper because fees derived on funds loaned to finance withdrawals by ATM users were deductible under Section 7-9-61.1. The Department's hearing officer concluded that "[t]he fees collected by AFT from ATM users to receive cash based on funds in their bank accounts are not receipts from charges made in connection with the origination, making or assumption of a loan or from charges made for handling loan payments." AFT now appeals.

## II. DISCUSSION

The sole question before us is whether surcharge fees collected by ATMs qualify as a deduction under Section 7-9-61.1. We will only set aside the hearing officer's decision and order if it is "(1) arbitrary, capricious[,] or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with the law." NMSA 1978, § 7-1-25 (1989). Interpretation of a statute is a question of law, which this Court reviews de novo. *See Morgan Keegan Mortg. Co. v. Candelaria*, 1998-NMCA-008, ¶ 5, 124 N.M. 405, 951 P.2d 1066.

In engaging in statutory construction, "[w]e begin with the plain meaning of the statute's words and construe its provisions together to produce a harmonious whole." *Rivera v. Flint Energy*, 2011-NMCA-119, ¶ 4, 268 P.3d 525. "But [we do not engage

in] an overly simplistic application of the plain-meaning rule, [as] it is part of the essence of judicial responsibility to search for and effectuate the legislative intent—the purpose or object—underlying the statute." *Bishop v. Evangelical Good Samaritan Soc'y*, 2009-NMSC-036, ¶ 10, 146 N.M. 473, 212 P.3d 361 (internal quotation marks and citation omitted). "Where an exemption or deduction from tax is claimed, the statute must be construed strictly in favor of the taxing authority, the right to the exemption or deduction must be clearly and unambiguously expressed in the statute, and the right must be clearly established by the taxpayer." *Sec. Escrow Corp. v. State Taxation & Revenue Dep't*, 107 N.M. 540, 543, 760 P.2d 1306, 1309 (Ct. App. 1988). "[T]axation is the rule and the claimant for an exemption must show that his demand is within the letter as well as the spirit of the law." *Id*. "[W]e must remain mindful that in resolving ambiguities in the statute or regulations which an agency is charged with administering, the [c]ourt generally will defer to the agency's interpretation if it implicates agency expertise." *Rio Grande Chapter of Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806 (internal quotation marks and citation omitted).

The statute at issue in this case states that "[r]eceipts from charges made in connection with the origination, making or assumption of a loan or from charges made for handling loan payments may be deducted from gross receipts." § 7-9-61.1. AFT

argues that "[c]ash advanced to bank customers from AFT's ATMs constitute loans to the banks." AFT states that "[t]he banks then repay these loans by removing from the bank customer's account the amount received from the ATM, and repaying it to AFT." In contrast, the Department argues, and the hearing officer agreed, that the fees are the result of a service provided to the customer to allow the customer to obtain immediate cash from his bank account and not a loan to the bank and, thus, is subject to gross receipts tax and not deductible. The central issue here is whether the ATM transaction constitutes a loan.

We analyzed a similar issue regarding whether real estate contracts with installment payments were loans under this same statute in *Security Escrow*. In *Security Escrow*, escrow agents attempted to deduct, under Section 7-9-61.1, the charges they collected for processing installment payments on real estate contracts held in escrow. *Sec. Escrow*, 107 N.M. at 542, 545, 760 P.2d at 1308, 1311. There, we stated that a loan is the "delivery of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional amount agreed upon for its use." *Id.* at 544, 760 P.2d at 1310.

> The four elements of a loan are: (1) a principal sum; (2) a placing of the sum with a borrower; (3) an agreement that interest is to be paid; and (4) a recognition by the receiver of money of his liability for return of the principal amount with accrued interest.

6

*Id.* Yet, we stated that the transaction at issue in the statute could not just meet the bare requirements of a loan under those above factors. Rather, "[w]e conclude[d] that the [L]egislature intended to allow the deduction from gross receipts under [Section 7-9-61.1] only for typical loan transactions involving both a *traditional* lender and borrower." *Sec. Escrow*, 107 N.M. at 545, 760 P.2d at 1311 (emphasis added).

In *Security Escrow*, we concluded that based upon this reading of the statute, any processing or collection charges typically made by escrow agents were not typical loan transactions between both a traditional lender and borrower and, thus, were not properly deductible under the statute. *Id.* at 544, 760 P.2d at 1310. We characterized the fees received by the escrow agents as "charges collected . . . for handling [installment] payments." *Id.* at 542, 760 P.2d at 1308. We also explained that "[t]o hold otherwise would in effect unfairly eliminate payment of gross receipts tax by escrow businesses throughout New Mexico for gross receipts derived from charges similar to those at issue in this case." *Id.* at 545, 760 P.2d at 1311. This Court reasoned that

> if we were to construe the statute as urged by [the escrow agents], we would in essence be deferring substance to form, thus encouraging escrow agents or the parties under any real estate contract to adopt certain contractual language making the transaction appear as a loan when in substance it is not. The sole purpose of such manipulative wording would be to improperly permit a deduction from gross receipts under the statute.

7

*Id.*

Likewise, in the present case, we conclude that AFT's ATM transactions are not traditional loans between AFT and the customer's bank under Section 7-9-61.1. Here, the customer, not the bank, is seeking to withdraw the funds from the ATM. The ATM transaction requires the customer to directly access his account and verify adequate funds before the ATM will provide cash disbursement. In return for the cash withdrawal, the customer authorizes the bank to give the loaned amount and surcharge fee to AFT. Therefore, as the hearing officer found, the bank cannot, as AFT contends, be called a traditional borrower in this context because its funds are never at risk. The hearing officer reasoned, and we agree, that had AFT truly made a loan to the bank, "there would be no need to verify money in a customer's account nor would the withdrawal or denial be based on whether the customer had sufficient funds in his/her account but rather the bank would borrow the money based on its own financial stature and be solely responsible for payment." It is the customer's funds, not the bank's, that reimburses AFT. The ATM transaction lacks both a *traditional* lender and borrower. AFT is a company that operates ATMs, not lending institutions like banks or credit unions. Banks are not traditional borrowers. There is no evidence that banks are performing more than a banking function by transferring funds owed by their customers to AFT. AFT appears merely to be providing a service through its

8

ATM consisting of convenient access to cash that is theirs for which customers compensate AFT with the surcharge fee. Thus, the surcharge constitutes a service fee and nothing more.

For this Court to conclude otherwise would effectively eliminate AFT's gross receipts tax on service fees for an activity that is not a borrowing transaction, but merely dispensing cash to customers that is their own and for which they bear no obligation of repayment. The cash-dispensing and delay in reimbursement are compensated by ATF's taxable service fee. Because of AFT's contract with the bank and the customer's agreement to the withdrawal of their own cash plus the fee, no loan is made. Allowing a deduction in this case is clearly contrary to the legislative intent in creating the tax deduction for fees in association with a typical loan.

Therefore, we conclude that AFT's ATM transactions are not typical loan transactions with a traditional lender and borrower in accordance with Section 7-9-61.1 and that the $2 or $3 surcharges are paid in exchange for the service AFT provides in dispensing cash to customers. We hold that Section 7-9-61.1 does not give AFT a deduction for the surcharges, and AFT is liable to pay gross receipts tax on the surcharges.

## III. CONCLUSION

For the reasons stated above, we affirm the decision of the Department's hearing officer.

**IT IS SO ORDERED.**

_____
**RODERICK T. KENNEDY, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**J. MILES HANISEE, Judge**